UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RAZZAC ABDULLAH,

                 Plaintiff,

                                       3:08-CV-0579
v.                                       (GTS/DEP)

PANKO ELEC. & MAINT., INC.;
BARBARA PANKO; MIKE PANKO, SR.; and
MIKE PANKO, JR.,

                 Defendants,
_____

APPEARANCES:                             OF COUNSEL:

LEBOW & ASSOCIATES, PLLC           JAMES B. LEBOW, ESQ.
   Counsel for Plaintiff                    DANIEL E. RUBENSTEIN, ESQ.
570 Lexington Avenue - 16th Fl          MEGAN K. PRICE, ESQ.
New York, NY 10022

HINMAN HOWARD & KATTELL, LLP      PAUL T. SHEPPARD, ESQ.
   Counsel for Defendants              DAWN J. LANOUETTE, ESQ.
P.O. Box 5250
80 Exchange Street
700 Security Mutual Building
Binghamton, NY 13902-5250

HON. GLENN T. SUDDABY, United States District Judge

## MEMORANDUM-DECISION and ORDER

      Currently before the Court in this employment discrimination action filed by Razzac

Abdullah ("Plaintiff") is a motion for summary judgment filed by Panko Electrical &

Maintenance, Inc., Barbara Panko, Mike Panko, Sr. and Mike Panko, Jr. ("Defendants").  (Dkt.

No. 35.)  For the reasons set forth below, Defendants' motion is granted in part and denied in

part.

I.      RELEVANT BACKGROUND

A.      Plaintiff's Claims

Generally, liberally construed, Plaintiff's Amended Complaint alleges, *inter alia*, as follows: (1) Plaintiff was employed by Defendant Panko Electrical & Maintenance, Inc. ("Panko") from April 1999 until December 2005; (2) throughout his employment, he was subjected to a hostile work environment based on of his race and/or religion as a black Muslim; (2) he was paid differently than were other Panko employees based on his race and/or religion; (3) he did not receive adequate training because of his race and/or religion; (4) he was laid off and terminated because of his race and/or religion; and (5) he was terminated also in retaliation for filing a complaint with the New York State Division of Human Rights regarding the discriminatory environment to which he had been subjected.  (*See generally* Dkt. No. 17 [Plf.'s Am. Compl.].)

Based on these allegations, Plaintiff's Amended Complaint asserts two causes of action that can be liberally construed as asserting the following claims: (1) a claim of racial and/or religious discrimination under 42 U.S.C. § 1981 and Section 296 of the New York State Human Right's Law ("NYHRL"); (2) a claim of hostile work environment based on race and/or religion under 42 U.S.C. § 1981 and the NYHRL; (3) a claim of retaliation based on race and/or religion under 42 U.S.C. § 1981 and the NYHRL; and (4) a claim of disparate treatment based on race and/or religion under 42 U.S.C. § 1981 and the NYHRL.  (Dkt. No. 17.)

Familiarity with the remaining factual allegations supporting these claims in Plaintiff's Amended Complaint is assumed in this Decision and Order, which is intended primarily for the review of the parties.  (*Id.*)

2

**B.      Undisputed Material Facts**

The following is a general summary of material facts that are undisputed by the parties. (*Compare* Dkt. No. 35, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 39 [Plf.'s Rule 7.1 Response and Counter Statement] *and* Dkt. No. 41, Attach. 1 [Defs.' Rule 7.1 Counter Statement].)

**1.      Summary of Plaintiff's Employment History with Panko**

Plaintiff is a black Muslim.  In February 1999, he commenced his employment with Panko.  At some point on or about his start date, Plaintiff received a copy of an Employee Handbook.[1]

At the time, Plaintiff was hired as an electrician's helper.[2]  He held that position for approximately three months while his application for a New York State apprenticeship was pending.  During that time, he reported directly to Mike Jr., Mike Sr. or Barbara Panko ("Barbara"), doing work in the shop or, occasionally, in the field.

In May 1999, after his application for the apprenticeship program was approved, Plaintiff began working as an apprentice.  Plaintiff's wage scale while an apprentice was set out in his apprenticeship agreement, which he, Panko, and the State of New York signed.  As an apprentice, Plaintiff was required to attend a number of hours of classroom hours as well as on-the-job training.

---

[1]      The parties dispute whether the Handbook that Plaintiff received contained a complaint procedure.  (*Compare* Dkt. No. 35, Attach. 1, at ¶¶ 8-9, *with* Dkt. No. 39 at ¶¶ 8-9.)

[2]      Plaintiff was hired by Mike Panko, Jr. ("Mike Jr."), and his father, Mike Panko, Sr. ("Mike Sr.").

Plaintiff subsequently passed his journeyman's license exam, and completed the apprenticeship program on August 15, 2005. At that time, Plaintiff became a journeyman electrician.

Plaintiff was terminated from Panko in December 2005.

## 2.    Incidents of Discrimination Involving Jim McDermott

Jim McDermott was a foreman at Panko who Plaintiff was assigned to work with on certain occasions. Plaintiff testified that, on many occasions, McDermott would refer to him as his "slave." Plaintiff also testified that, on other occasions, when McDermott would get upset with him, McDermott would stand in front of other workers on the job site, curse and act like a madman, and call him a "stupid nigger."

In 1999, while working at Barbara's house, McDermott referred to Plaintiff in an offensive manner.[3] Barbara heard McDermott make the offensive reference and told him to calm down.[4] Plaintiff testified that, on a separate occasion in October 1999, he overheard McDermott ask Mike Sr. why he had to work with a "green nigger." Plaintiff also testified that he heard Mike Sr. tell McDermott to "calm down."

In 2001, Plaintiff worked with McDermott on a job site in Oneonta, New York. Plaintiff testified that, while on the job site, McDermott used racially offensive language toward him, such as "stupid nigger," "porch monkey" and "Muslim nigger." At some point during the same year, McDermott began "spitting and cursing" while working with Plaintiff. Plaintiff

---

[3]    The parties dispute the exact nature of this offensive reference, and whether it related to Plaintiff's race.

[4]    The parties dispute whether Barbara also removed McDermott from the site.

complained to his foreman, Joe Panko (the brother of Mike Sr. and the uncle of Mike Jr.), that he could not work with McDermott.  Neither Joe Panko nor Plaintiff communicated this complaint to Panko management.  However, at an unspecified date and time, Plaintiff complained to Mike Jr. about McDermott's behavior.  After he complained about McDermott, Plaintiff did not have to work with him as frequently.  In April or May 2003, McDermott, who was abusive to *all* employees at Panko, was terminated for his outbursts.

### 3.      Incidents of Discrimination Involving Bill Cummings

In 2001, Plaintiff worked with Bill Cummings at Keuka Park.  Plaintiff testified that Cummings made statements to him to the effect that black and white people should not intermingle, and that Plaintiff's Caucasian wife was a "mud shark lover."[5]

Plaintiff also testified that, during that same year, while he was speaking with Bill Cummings about the events of September 11, 2001, Cummings told Plaintiff that "what we're going to do with the Allah freaks is give them 13 wraps to all you guys."  Plaintiff did not tell anyone at Panko about Cummings's comment.  Plaintiff also testified that, in 2001, Bill Cummings called him a "Muhammadan" or an "Allah freak," and that, at an unknown date and time, Cummings referred to him as "Buddha."

In March 2003, Plaintiff was working with Bill Cummings on a Burlington Coat Factory job site.  Plaintiff testified that he thought he overheard Bill Cummings call him a "nigger" during a conversation with other employees, including Mike Jr.[6]  Plaintiff testified that, shortly thereafter, he confronted Cummings about the conversation.  Bill Cummings then complained

---

[5]      The parties dispute whether these comments were reported to management.

[6]      Defendants dispute that Mike Jr. heard anyone call Plaintiff a "nigger."

about Plaintiff's work and/or behavior on the job site.  In order to eliminate the conflict, Plaintiff

was removed from the job site and placed on a different job.

### 4.    Incidents of Discrimination Involving Bill Pickens

On September 11, 2001, Plaintiff was working with foreman Bill Pickens at a job site.

After learning about the terrorist attacks, Pickens searched Plaintiff's lunch box for bombs.[7]

Plaintiff testified that Pickens also questioned him about what he was doing in the United States,

offered him a "conversion kit" of beer and scissors, and called him a "sleeper cell" and a relative

of Saddam Hussein.

Plaintiff testified that, shortly after September 11, 2001, he told Chris Hagen, the office

secretary, that he was being harassed about his religion and needed to take a week off from work.

Plaintiff testified that Ms. Hagen told him that she hoped everything was all right and that she

would see him when he came back.  Plaintiff did not ask Ms. Hagan to tell anyone in Panko

management about the incident.  However, Plaintiff testified that, in late 2001 or early 2002, he

complained to Mike Jr. about his lunch box being searched.

Plaintiff testified that, in 2002, Bill Pickens made fun of his middle name (Hussein),

stating "we've got a Hussein here."  Plaintiff did not complain to anyone at Panko about the

Hussein comment.  Plaintiff also testified that, during the same year, Bill Pickens laughed when

a circuit exploded and stated that he wanted to see Plaintiff get darker than he was.  Plaintiff

testified this was the second time that Pickens laughed at him when he worked on an active

circuit.[8]  Plaintiff further testified that, on unspecified occasions, Bill Pickens told him not to

---

[7]     The parties dispute whether Pickens later apologized to Plaintiff.

[8]     The parties dispute whether these incidents were reported to management.

take electrical wire home, because Pickens believed that Plaintiff would try to blow something up.[9]

### 5.     Incidents of Discrimination Involving Chris DiLuzio

Plaintiff testified that, in 2002 or 2003, Chris DiLuzio called him a "nigger" on a job site.[10]  Plaintiff also testified that, in 2005, while on a job site in Ithaca, New York, DiLuzio called him a "stupid nigger."  At another point during the same year, and at the same job site in Ithaca, Plaintiff was working on a ladder and climbing through the rafters of a building.  When Plaintiff appeared to have difficulties moving around in the rafters, DiLuzio said to Mark Travis (a white employee), in Plaintiff's presence, "Oh, so they didn't evolve from monkeys."  Plaintiff does not think that he complained about this incident.  However, after Plaintiff was terminated in December 2005, Mike Jr. confronted DiLuzio about the "evolution" comment and reprimanded him for it.

### 6.     Incidents of Discrimination Involving Richard Harmon

In 2002, Plaintiff brought a bottle of salad dressing to his work site and shared it with co-workers.  Richie Harmon took the salad dressing bottle and used it in such a manner that the nozzle of the bottle touched his ham sandwich.  Plaintiff became angry and threw the bottle at the wall.  Later that week, on the drive home from a job site, Harmon bumped Plaintiff's car with his vehicle on the highway.[11]  Plaintiff reported the incident to Mike Jr., complaining that Harmon's behavior threatened Plaintiff's life.  Plaintiff also testified that, in 2002 or 2003,

---

[9]      The parties dispute whether any of these incidents were reported to management.

[10]      The parties dispute whether this comment was reported to management.

[11]      The parties dispute, among other things, whether Plaintiff contacted Harmon's vehicle first.

Harmon asked Plaintiff to buy him cocaine and stated, "[This is] what you people do."  Plaintiff informed Harmon that he did not do that.[12]

### 7.      Incident of Discrimination Involving Dave Martin

Plaintiff testified that, while working on a job site with Dave Martin at an unknown date and time, he was working near a "bussed up electrical system" and Martin told him to be careful because he would be a "darker nigger" if he fell into the system.  Plaintiff did not tell anyone at Panko about this incident.

### 8.      Facts Regarding Plaintiff's Training

Joe Panko trained Plaintiff in blueprint reading.  On at least one occasion, Bill Pickens gave Plaintiff a set of blue prints to work with while he was an apprentice.  Plaintiff also purchased books to assist himself with reading blue prints.  Plaintiff did not fully learn to read blue prints until after his employment with Panko.

### 9.      Facts Regarding Plaintiff's Pay

Upon receiving his journeyman's license, Plaintiff was not initially paid as a journeyman.  After Plaintiff provided management with documentation that he had received his license (in the form of a certificate for completion of the apprenticeship program), he began being paid at the journeyman's rate.  Dan Hawk, a white employee, was likewise required to produce documentation (i.e., a certificate) that he had completed the apprenticeship program before being paid journeyman's wages.

At the time he was terminated, Plaintiff complained that he had not received the correct pay for his first job as a journeyman.  Panko investigated, and Plaintiff was subsequently paid the difference for the job.

---

[12]      The parties dispute whether this incident was reported to management.

#### 10.    Facts Regarding Plaintiff's Layoff and Termination

In July 2005, Plaintiff was working at the Elmira prison. Plaintiff was told that his last day at that job site would be Thursday, July 14, 2005. Later, Mike Jr. called Plaintiff and left a message indicating that he had a new assignment for Plaintiff.[13] On Sunday, July 17, 2005, Mike Jr. received a call from the foreman on the job to which Plaintiff had been reassigned, indicating that he had not heard from or seen Plaintiff. Mike Jr. then contacted Plaintiff, who informed Mike Jr. that he was going back to the Elmira prison job site. Mike Jr. told him to take a week off to think about for whom he worked.[14] Instead of taking time off, Plaintiff went back to the Elmira prison job site and was given work by Joe Panko. Mike Jr. was unaware that Plaintiff worked at the Elmira prison job site until two weeks later.

In October 2005, Plaintiff was assigned to work at the Elmira prison. The foreman on the job site was Joe Panko. On October 7, 2005, Plaintiff was notified that he was being laid off from work and that he should call the office for additional instruction. Although he was not told to do so, the next week Plaintiff returned to work at the Elmira prison, where he was given work by Joe Panko. Plaintiff worked at the job site for two and a half days when he received a phone call from Mike Jr. telling him that he was not supposed to be on the Elmira job site. Mike Jr. determined Plaintiff's return and work at the job site to be insubordination. On October 18, 2005, Plaintiff was notified, in writing, that he was being laid off until further notice.

Later that day, Plaintiff met with Leo Kane, the New York State Apprenticeship Program Coordinator for Panko, and complained about his lay off, his job assignments, his pay, and his

---

[13]    The parties dispute whether Mike Jr. told Plaintiff who to contact and where to report for the new assignment.

[14]    The parties dispute whether Plaintiff was ever told of the location of the new job site.

belief that he was being discriminated against.  Kane told Plaintiff to file his discrimination

claim with the Division of Human Rights, and indicated that he would look into what he could

do for Plaintiff.

Kane scheduled an appointment with Mike Jr. for December 13, 2005.  On December 13,

2005, Kane met with Mike Jr., and spoke with him about Plaintiff and his layoff.  Kane does not

recall telling Mike Jr. that Plaintiff was called the "N" word, nor does Kane recall telling Mike

Jr. that Plaintiff was going to the Division of Human Rights to file a complaint.  At that meeting,

Mike Jr. stated that Plaintiff was laid off because of a lack of work, not a lack of ability.  Kane

testified that Mike Jr. also indicated that Plaintiff was not subjected to discrimination.

On December 19, 2005, Plaintiff returned to work at Panko.  Plaintiff worked a job in

Syracuse for a week.  He was then assigned to work at SUNY Binghamton.  On the evening of

December 26, 2005, Mike Jr. called Plaintiff and left him a message telling him to report to the

shop at 7:30 a.m. for a different job, and to call back and leave a message that he received the

instruction.  The new assignment involved outdoor electrical work and was an opportunity for

Plaintiff to independently run a job.

Plaintiff called Mike Jr. back, but did not leave a message.  The next day, at 6:30 a.m.,

Plaintiff called Mike Jr. and left a message indicating that he could not do the job, and that he

would be going back to SUNY Binghamton.  Plaintiff went back to SUNY Binghamton.  Mike

Jr. called the SUNY Binghamton job site, and Plaintiff was informed that he was to report to the

office. When he arrived at the office, Mike Jr. attempted to discuss the outdoor job with him.

Plaintiff's excuse for not reporting as directed was that he did not have winter gear, which had

been destroyed in November.  Mike Jr. told Plaintiff he was tired of his excuses and terminated

his employment.

On December 30, 2005, Plaintiff and his father met with Barbara and Mike Jr.  Plaintiff complained to Barbara about his alleged treatment at Panko.  Plaintiff testified that Barbara offered to place him on probation; however, because Mike Jr. did not agree to this, he was terminated.

### 11.    Management's Non-Use of Derogatory Language

Throughout Plaintiff's employment at Panko, Mike Sr. never said anything derogatory to Plaintiff about his race or religion.  Barbara also did not use any racially or religiously derogatory language around Plaintiff.  Plaintiff did not complain to Barbara about racial or religious discrimination prior to his termination.  Plaintiff testified that, to his knowledge, only one person used derogatory language in front of Mike Jr., which occurred in 2003.  Mike Jr. did not use any derogatory language or make any comments to Plaintiff about his race or religion.

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement, Rule 7.1 Response and Counter Statement, and Rule 7.1 Response to the Counter Statement is assumed in this Decision and Order, which (again) is intended primarily for the review of the parties.  (*Id*.)

### C.    Defendants' Motion

Generally, in support of their motion for summary judgment, Defendants argue as follows: (1) Plaintiff's religious discrimination claims under Section 1981 must be dismissed because Section 1981 does not apply to religious discrimination; (2) Plaintiff's racial discrimination claims under Section 1981 and the NYHRL, and his religious discrimination claim under the NYHRL, must be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that he suffered adverse employment action based on his race or religion; (3) Plaintiff's hostile work environment claims must be

dismissed because (a) the alleged harassment is barred by the statute of limitations, (b) Plaintiff's claims of harassment are based solely on "stray comments" that are insufficient as a matter of law to constitute a hostile work environment, and (c) Plaintiff unreasonably failed to use Panko's complaint procedure regarding this claim; (4) Plaintiff's claims of disparate treatment in pay and training must be dismissed because they are unsupported by any admissible record evidence; (5) Plaintiff's retaliation claims based on his layoff and termination must be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that his layoff and/or termination was retaliatory in nature; and (6) Plaintiff's claims against the individual Defendants must be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that any of these Defendants were personally involved in any of the alleged discriminatory activity.  (*See generally* Dkt. No. 35, Attach. 21 [Defs.' Memo. of Law].)

In Plaintiff's response to Defendants' motion for summary judgment, he argues as follows: (1) he has adduced admissible record evidence from which a rational factfinder could conclude that his layoff was discriminatory; (2) his hostile work environment claim should not be dismissed because (a) the continuing-violation doctrine renders timely all of the incidents of harassment, (b) his claims are not based on isolated "stray comments" but rather on harassment that was sufficiently frequent and severe as to alter the conditions of his employment and create an abusive working environment, and (c) he was never made aware of the complaint procedure regarding this claim, and in any event he did notify management of the discrimination to which he was subjected; (3) he has adduced admissible record evidence from which a rational factfinder could conclude that his termination was retaliatory; (4) his claims against the individual Defendants should not be dismissed because he has adduced admissible record

evidence from which a rational factfinder could conclude that the individual Defendants were personally involved in the discrimination in question; (5) he has not attempted to assert a disparate treatment claim based on inadequate pay or training, "but has only cited these instances as further evidence of discriminatory treatment"; and (6) while he cannot bring a religious discrimination claim under Section 1981, he may bring a religious discrimination claim under the NYHRL.  (*See generally* Dkt. No. 38 [Plf.'s Response Memo. of Law].)

In their reply, in addition to reiterating previously advanced arguments, Defendants argue, *inter alia*, as follows: (1) Plaintiff's failure to complain to Barbara about being harassed is fatal to his hostile-work-environment claims; (2) Plaintiff has failed to adduce admissible evidence from which a rational factfinder could conclude that Defendants acted with racial or religious animus, which is necessary to overcome Panko's legitimate non-discriminatory reasons for Plaintiff's layoff; and (3) Plaintiff's admissions are fatal to his wrongful-termination claim. (*See generally* Dkt. No. 41 [Defs.' Reply Memo. of Law].)

## II.     RELEVANT LEGAL STANDARDS

### A.     Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

B.      **Legal Standards Governing Plaintiff's Claims**

Again, because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standards governing Plaintiff's claims in this action, the Court will not recite, in their entirety, those legal standards in this Decision and Order, which (again) is intended primarily for the review of the parties.  (*See* Dkt. No. 35, Attach. 21 [Defs.' Memo. of Law]; Dkt. No. 38 [Plf.'s Response Memo. of Law]; Dkt. No. 41 [Defs.' Reply Memo. of Law].)

III.    **ANALYSIS**

A.      **Plaintiff's Claims of Racial and/or Religious Discrimination Under 42 U.S.C. § 1981 and the NYHRL**

1.      **Plaintiff's Claim of Religious Discrimination Under 42 U.S.C. § 1981**

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Section 1981 does not apply to religious discrimination.  Defendants are correct that Section 1981 "protects [only] against racial discrimination."  *Emmons v. City Univ. of New York*, 715 F. Supp.2d 394, 415 (E.D.N.Y. 2010); *see also Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993) (noting that one of the elements of a Section 1981 claim is "an intent to discriminate on the basis of race").  As a result, Plaintiff's claim of religious discrimination under Section 1981 is dismissed.

2.      **Plaintiff's Claims of Racial Discrimination Under Section 1981, and Racial and/or Religious Discrimination Under the NYHRL**[15]

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of these discrimination claims because Plaintiff has failed to adduce record evidence establishing

---

[15]     "Courts require the same standards and burdens of proof for claims brought under . . . § 1981, and the NYHRL."  *Ayton v. Lenox Hill Hosp.*, 93-CV-6601, 1997 WL 10000, at *1 n.1 (S.D.N.Y. Jan. 9, 1997) (collecting cases).

that his layoff and/or termination was discriminatory.  Based on the current record, the Court agrees with Defendants.

Claims of racial discrimination are governed by the burden-shifting analysis announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  "Under the burden-shifting rules set forth in *McDonnell Douglas* . . . , a plaintiff has the initial burden of making out a prima facie case of discrimination."  *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001). "This may be accomplished by showing (1) membership in a protected class; (2) satisfactory job performance; (3) termination from employment or other adverse employment action; and (4) the ultimate filling of the position with an individual who is not a member of the protected class [or] . . . that the discharge or adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of plaintiff's membership in that class."  *Farias*, 259 F.3d at 98.

"If a plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination."  *Id*.  "The defendant is not required to prove that the articulated reason actually motivated its actions."  *Id*. "If the defendant fails to discharge the burden by presenting a nondiscriminatory reason, the plaintiff will prevail (assuming the other aspects of the prima facie case are not contested)." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

"If the defendant bears its burden of production, the presumption drops out of the analysis . . . and the defendant 'will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.'"  *Farias*, 259 F.3d at 98 (quoting *James*, 233 F.3d at 154).  "Evidence that the defendant's articulated

nondiscriminatory reason is false, when added to the prima facie case, may or may not be 'sufficient to support a reasonable inference that prohibited discrimination occurred' and warrant submitting the case to the jury." *Id.* (quoting *James*, 233 F.3d at 156).

Here, it is undisputed that (1) Plaintiff is a member of a protected class, (2) he did not initially receive a salary increase after receiving his journeyman's license, (3) he was laid off from work in October 2005, (4) in the same month, he complained to Leo Kane about being subjected to discriminatory treatment at Panko, (5) in December 2005, Leo Kane met with Mike Jr. to talk about Plaintiff and his layoff, and (6) Plaintiff was terminated shortly thereafter. Under the circumstances, Plaintiff has established a prima facie case of discrimination.[16]

However, in response to Plaintiff's claim of discrimination, Defendants have articulated legitimate, nondiscriminatory reasons for the alleged adverse employment actions and termination. More specifically, Defendants have adduced admissible record evidence establishing that a white employee, Dan Hawk, also did not receive a raise in pay immediately after receiving his journeyman's license, and that the delay experienced by both Hawk and Plaintiff was as a result of their failure to obtain a certificate for completion of the apprenticeship program. Defendants have also adduced admissible record evidence establishing that Plaintiff did receive training in the areas in which he claims he was not adequately trained. In addition,

---

[16]     The Court notes that Plaintiff may not make out a prima facie case of discrimination based on incidents of harassment. This is because adverse employment action requires a "'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Galabya*, 202 F.3d at 640; *see also Davis v. City Univ. of New York*, 94-CV-7277, 1996 WL 243256, at *8 (S.D.N.Y. 1996) ("A materially adverse change is one that 'has an attendant negative result, a deprivation of a position or an opportunity.'") (quoting *Medwid v. Baker*, 752 F. Supp. 125, 136-37 [S.D.N.Y. 1990]).

Defendants have adduced admissible record evidence establishing that Plaintiff was laid off because of his insubordination and a lack of work, and that he was ultimately terminated because of his insubordination.  As a result, Plaintiff must point to evidence that reasonably supports a finding of prohibited discrimination.

In an effort to satisfy his burden of demonstrating that Defendants' reasons for their actions are pretextual, Plaintiff argues that the admissible record evidence establishes that (1) he was not insubordinate before he was laid off or terminated, and (2) there was not a lack of work for him to do when he was laid off.[17]  After carefully reviewing the record, the Court disagrees.

With regard to Plaintiff's layoff, the undisputed record evidence establishes that, in July 2005, Plaintiff was informed that his last day working at the Elmira prison job site would be Thursday, July 14, 2005.  While the parties dispute whether Plaintiff was told where he would be reassigned, it is undisputed that, after he did not show up at the next site where management wanted him to work, he was told by Mike Jr. on or about Sunday, July 17, 2005, that he was to take a week off to think about for whom he worked.  It is further undisputed that, instead of taking time off, Plaintiff went back to work at the Elmira prison job site.

Approximately three months later, while Plaintiff was again working at the Elmira prison job site, he was notified that he was being laid off from work, and that he should call the office for additional instructions.  However, although he was not told to do so, the next week Plaintiff returned to work at the Elmira prison, where he was given work by the foreman on that job site. After two and a half days of working on the Elmira prison job site, Plaintiff received a call from

---

[17]     Plaintiff does not make any arguments (let alone adduce any admissible record evidence establishing) that Defendants' reason for not increasing his wages immediately after he received his journeyman's license was pretextual.  Nor does Plaintiff adduce any admissible record evidence establishing that he was trained differently than other apprentices *because of* his race or religion.  As a result, Plaintiff has failed to satisfy his burden of demonstrating discrimination based on either of these issues.

Mike Jr. telling him that he was not supposed to be on the Elmira prison job site, and that he was to leave.  On October 18, 2005, Plaintiff was notified, in writing, that he was being laid off until further notice.

Based on these undisputed facts, no rational factfinder could conclude that Plaintiff's rather obvious disregard for Mike Jr.'s instructions, on two separate occasions within a three month span, did not constitute insubordination.  Plaintiff's argument that he should not have been laid off because there was work for him to perform on both occasions misses the point.  In addition, even assuming, for the sake of argument, that Plaintiff had established that his failure to follow the directions of Mike Jr. on two separate occasions did not constitute insubordination, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that either (1) while he was laid off, his position was filled by anyone (let alone an individual who is not a member of the protected class), or (2) he was laid off *because of* his race and/or religion.  For these reasons, Plaintiff's discrimination claim based on his layoff is dismissed.

With regard to Plaintiff's termination, the undisputed record evidence establishes that, on December 19, 2005, Plaintiff returned to work at Panko.  Plaintiff then worked a job in Syracuse for a week.  He was then assigned to work at a SUNY Binghamton job site.  On Monday, December 26, 2005, Mike Jr. called Plaintiff in the evening and left him a message telling him to report to the shop the next day at 7:30 a.m. for a different job, and to call back and leave a message that he received the instruction.  The new assignment involved outdoor electrical work.

Plaintiff called Mike Jr. back, but did not leave a message.  On Tuesday, Plaintiff called Mike Jr. at 6:30 a.m. and left a message indicating that he could not do the job, and that he would be going back to the job site at SUNY Binghamton.  Plaintiff went back to job site at

SUNY Binghamton.  Mike Jr. called the SUNY Binghamton job site, and Plaintiff was informed that he was to report to the office.  When he arrived at the office, Mike Jr. attempted to discuss the outdoor job with him.  Plaintiff's excuse for not reporting as directed was that he did not have winter gear, which had been destroyed in November.  Mike Jr. told Plaintiff he was tired of his excuses and terminated his employment.

Based on these facts, no rational factfinder could conclude that Plaintiff's rather obvious disregard for Mike Jr.'s instructions did not constitute insubordination.  Had Plaintiff left a message with Mike Jr. on the evening of December 26, 2005 (as he was instructed), Mike Jr. could have made arrangements to obtain the necessary outdoor gear for Plaintiff, and/or assign a different employee to the job.  Instead, Plaintiff decided, without first obtaining approval from Mike Jr., that he would return to the SUNY Binghamton job site.  The Court notes that Plaintiff had already been laid off for twice engaging in similar conduct (i.e., in July 2005, and October 2005).  *See Mangaroo v. Boundless Techn., Inc.*, 253 F. Supp.2d 390, 399-400 (E.D.N.Y. 2003) (dismissing plaintiff's Title VII race discrimination claim because plaintiff failed to adduce record evidence establishing that employer's explanation for termination, namely insubordination in refusing to report to work station when directed by supervisor, was pretextual).  In addition, even assuming, for the sake of argument, that Plaintiff had established that his failure to follow the directions of Mike Jr. did not constitute insubordination, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that either (1) his position was filled by anyone (let alone an individual who is not a member of the protected class), or (2) he was terminated *because of* his race and/or religion.  For these reasons, Plaintiff's discrimination claim based on his termination is dismissed.

19

B.     **Plaintiff's Claims of Hostile Work Environment Under 42 U.S.C. § 1981 and the NHHRL**[18]

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of

Plaintiff's hostile work environment claims because (1) the alleged harassment is barred by the

statute of limitations, (2) Plaintiff's claims of harassment are based solely on "stray comments"

that are insufficient as a matter of law to constitute a hostile work environment, and (3) Plaintiff

unreasonably failed to use the complaint procedure.  Based on the current record, the Court

rejects Defendants' arguments.

1.     **Whether Claims Arising from Certain Alleged Instances of Harassment Are Barred by the Statute of Limitations**

The statute of limitations on federal claims brought under 42 U.S.C. § 1981 is four years.

*Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 371 (2004) (citing 28 U.S.C. § 1658); *Quinn*

*v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998).  The statute of limitations for

actions brought under the NYHRL is three years.  *Van Zant v. KLM Royal Dutch Airlines*, 80

F.3d 708, (2d Cir. 1996); *Kimmel v. State*, 49 A.D.3d 1210, 1211 (N.Y. App. Div. 4th Dept.

2008).  However, "[u]nder the continuing violation doctrine, a plaintiff may bring suit based on

conduct that occurred outside of the statute of limitations period, provided that the conduct is

part of specific discriminatory policies or practices."  *Early v. Wyeth Pharm., Inc.*, 603 F.

Supp.2d 556, 571 (S.D.N.Y. 2009) (citing *Cornwell v. Robinson*, 23 F.3d 694, 704 [2d Cir.

1994]).  "The policy need not be 'formal' or 'widespread,' but the employer must permit the

---

[18]     "Hostile work environment claims under . . . § 1981 [and] NYSHRL . . . are . . . analyzed using the same standard."  *Jean-Louis v. Am. Airlines*, 08-CV-3898, 2010 WL 3023943, at *9 n.12 (E.D.N.Y. July 30, 2010).

conduct 'to continue unremedied for so long that its inaction may reasonably be viewed as tantamount to a policy or practice of tolerating such discrimination.'" *Early*, 603 F. Supp.2d at 571 (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 362 [2d Cir. 2001]); *Nat'l RR Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002) ("[C]onsideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory period, is permissible for the purpose[ ] of assessing liability, so long as an act contributing to that hostile work environment takes place within the statutory time period.").

Here, Plaintiff has adduced admissible record evidence from which a rational factfinder could conclude that, in 2005 (i.e., within the limitations period for both his Section 1981 and NYHRL claims), he was subjected to racially derogatory remarks on three separate occasions by two different individuals.  More specifically, Plaintiff has adduced admissible record evidence from which a rational factfinder could conclude that, on two separate occasions at a job site in Ithaca, New York, Chris DiLuzio made racially derogatory remarks about Plaintiff, and on one occasion at a job site in Masonville, New York, Bill Cummings made a racially derogatory remark about Plaintiff in the presence of two other workers.

In addition, Plaintiff has adduced admissible record evidence from which a rational factfinder could conclude that (1) in addition to DiLuzio and Cummings, at least four other employees at Panko made similar remarks to him over a span of six years,[19] (2) on many of the

---

[19]       More specifically, Plaintiff has adduced admissible record evidence from which a rational factfinder could conclude the following: (1) in 1999, McDermott referred to Plaintiff as his "slave" on "many occasions"; (2) in 1999, McDermott called Plaintiff a "stupid nigger" in front of other co-workers on more than one occasion (and even once in front of Barbra Panko); (3) in 1999, in the presence of Mike Sr., McDermott referred to Plaintiff as a "green nigger"; (4) in the winter of 2001, during a conversation with Barbara Panko and Mike Sr., Bill Cummings referred to Plaintiff as a "nigger" who works "slow," and indicated that he did not want Plaintiff on his job; (5) in 2001, while working on a job site in Oneonta, McDermott called Plaintiff a

occasions in which these remarks were made, other workers were present (including, on some

occasions, one or more members of management), (3) in addition to being present for some of

these racially derogatory remarks, Mike Jr. (a member of management) was made aware of some

of these instances of racial harassment on more than one occasion, and (4) management did not

always address the racial and/or religious harassment of which they were made aware, and when

they did address the harassment, their manner of addressing it did not prevent the harassment

from reoccurring.

    Under these circumstances, a rational factfinder could conclude that Defendants' actions

(or inaction) created a policy of discrimination within the work environment, and that the

employees at Panko were aware of this policy (as evidenced by the number of individuals who

made comments, which were similar in nature and stated in the presence of other co-workers).

As a result, the Court finds that, with regard to Plaintiff's hostile-work-environment claims, the

---

series of racially derogatory names; (6) in 2002, while on a job site, Bill Pickens deliberately
assigned him to work on a live circuit, and told Plaintiff that he wanted to see Plaintiff "get
darker than he [is]"; (7) in 2002, Dave Martin told Plaintiff while he was working on a live wire
that he should watch his step or he would be a "darker nigger"; (8) in 2002-03, DiLuzio referred
to Plaintiff in the presence of other co-workers as a "stupid nigger"; (9) between 2001 and 2004,
Bill Cummings directed a variety of other racially derogatory remarks at Plaintiff, which
included calling his Caucasian wife a "mud shark lover," and telling him that African Americans
are inferior to Caucasians; (10) in or around 2002-03, Richie Hammond asked Plaintiff to
purchase drugs for him, and indicated to Plaintiff that he was sure Plaintiff had friends who
could obtain the drugs because "you all sell drugs"; (11) in March 2003, while on a Burlington
Coat Factory job site, Plaintiff thought he overheard Bill Cummings call him a "nigger"; (12) in
2004, on a job in Roscoe, New York, Bill Pickens asked Plaintiff how he was feeling about his
upcoming journeyman's exam, and told Plaintiff that when he took the exam he would be
"sweating like a nigger trying to read"; and (13) on various occasions, Plaintiff was referred to
by his co-workers as "sausage lips."  Plaintiff has also adduced admissible record evidence from
which a rational factfinder could conclude that there were additional instances in which he was
subjected to racially derogatory remarks, as well as instances in which he was harassed based on
his religion.  Finally, Plaintiff has adduced admissible record evidence from which a rational
factfinder could conclude that, as a result of this harassment, he felt humiliated, demoralized and
deflated.

continuing-violation doctrine applies; and therefore Plaintiff may challenge all of the conduct that formed part of the alleged policy or practice of discrimination, even the conduct that would have otherwise occurred outside the statute of limitations period.[20]

> **2.      Whether Plaintiff's Claims of Harassment Are Insufficient as a Matter of Law to Constitute a Hostile Work Environment and/or Whether Those Claims Should Be Dismissed Based on His Failure to Use the Complaint Procedure**

Defendants argue that Plaintiff's claims of harassment are based solely on "stray comments" that are insufficient as a matter of law to constitute a hostile work environment. Essentially, Defendants argue that the Court should consider only allegations regarding incidents that occurred on or after January 2, 2005, and that because Plaintiff has adduced record evidence of only three such incidents, Plaintiff's hostile work environment claim must be dismissed. Defendants further argue that, even if his work environment was hostile, and Mike Jr. was insufficiently responsive to Plaintiff's complaints, Plaintiff's failure to complain to Barbara Panko, as required by the employee handbook, is fatal to his hostile-work-environment claim. Based on the current record, the Court rejects Defendants' arguments.

> **a.      Legal Standard Governing Claims of Hostile Work Environment**

"To establish a claim of hostile work environment, a plaintiff must show that: (1) he or he was subjected to harassment because of his or her membership in a protected class that was so

---

[20]      The Court notes that, "[b]ecause a hostile work environment claim focuses on the nature of the workplace environment as a whole," evidence of some instances of religious harassment and some instances of racial harassment may collectively constitute a hostile work environment.  *Williams v. Consol. Edison Corp. of N.Y.*, 255 F. App'x 546, 550 (2d Cir. Nov. 27, 2007) ("Looking at the totality of circumstances and the cumulative effect of these acts, Williams has provided sufficient evidence of gender-based and race-based harassment to create a dispute as to material facts that would support her hostile work environment claim.") (internal quotation marks omitted); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 572 (2d Cir. 2000) (holding that a jury could find that evidence of racial harassment exacerbated sexual harassment, and vice versa, given "the interplay between the two forms of harassment").

severe or pervasive as to alter the conditions of his or her employment; and (2) there is a specific basis for imputing the harassment to the defendant." *Little v. Nat'l Broad. Co., Inc.*, 210 F. Supp.2d 330, 388 (S.D.N.Y. 2002) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 [2d Cir. 1995], *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 118 S. Ct. 2257 [1998], and *Faragher v. City of Boca Raton*, 118 S. Ct. 2275 [1998]).

"The test for the first prong is whether the employment environment was 'objectively hostile'–that is, whether the environment was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Little*, 210 F. Supp.2d at 388 (S.D.N.Y. 2002). "The Supreme Court has emphasized that the standard for judging whether a work environment is objectively hostile must be sufficiently demanding so as to prevent Title VII from becoming a general civility code." *Little*, 210 F. Supp.2d at 388 (internal quotation marks omitted). "Courts must distinguish between merely offensive and boorish conduct and conduct that is sufficiently severe or pervasive as to alter the conditions of employment." *Id.* (internal quotation marks omitted).

"In determining whether a workplace is objectively hostile, a court should look at the totality of the circumstances." *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 [1993]). Factors that courts should examine include "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Forklift Sys., Inc.*, 510 U.S. at 23. "When evaluating the 'quantity, frequency, and severity' of the incidents, the court must look at the incidents 'cumulatively in order to obtain a realistic view of the work environment.'" *Little*, 210 F. Supp.2d at 389 (citing *Schwapp v. Town of Avon*, 118 F.3d 106, 111 [2d Cir. 1997]).

24

"Various types of acts, depending on their severity or pervasiveness, can create a hostile work environment." *Id*. "Courts have found that a series of racist comments directed at an employee can create a hostile work environment." *Id*. (citing *Schwapp*, 118 F.3d at 112). "Similarly, the . . . use of racial epithets, without more, may create a hostile work environment if sufficiently continuous and pervasive." *Id*. (citing *Snell*, 782 F.2d at 1103). However, "[f]or acts of racial discrimination such as racist comments, slurs and jokes to be actionable, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs there must be a steady barrage of opprobrious racial comments." *McCoy v. City of New York*, 131 F. Supp.2d 363, 372 (E.D.N.Y. 2001) (citing *Schwapp*, 118 F.3d at 110-11 [internal quotation marks omitted]). "Isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." *Little*, 210 F. Supp.2d at 389 (citing *Quinn*, 159 F.3d at 768).

In addition, racial epithets need not be directed at an employee to contribute to a hostile work environment, because "evidence of harassment of other members of the protected group, if part of a pervasive or continuing pattern of conduct, is surely relevant to show the existence of a hostile work environment." *Id*. (citing *Perry v. Ethan Allen, Inc*., 115 F.3d 143, 150 [2d Cir. 1997]). Moreover, racially offensive comments or incidents of racial harassment, though different in kind and occurring in different locations, may create a racially hostile work environment in violation of Title VII. *Id*. at 391.

"Even if a work environment is found to be abusive, however, a plaintiff must establish [the second prong of the standard governing claims of hostile work environment, namely] that the conduct which created the hostile environment should be imputed to the employer." *Tomka*,

66 F.3d at 1305, *abrogated on other grounds by Burlington Indus., Inc.*, 118 S. Ct. 2257, *and Faragher*, 118 S. Ct. 2275 (citing *Kotcher*, 957 F.2d at 63).  "[T]he Supreme Court [has] declined to announce a definitive rule on employer liability, holding instead that federal courts should be guided by common law principles of agency." *Tomka*, 66 F.3d at 1305 (citing *Meritor Sav. Bank v. Vinson*, 106 S. Ct. 2399, 2408 [1986]).[21]  In light of this holding, the Second Circuit has derived, from the applicable caselaw, certain rules to find an employer liable for permitting the existence of a hostile work environment.  *Id*.

Pursuant to these rules derived by Second Circuit, "if a plaintiff's supervisor is the alleged harasser, an employer will be liable if the supervisor uses his actual or apparent authority to further the harassment, or if the supervisor was otherwise aided in accomplishing the harassment by the existence of the agency relationship."  *Id*. (citing *Karibian v. Columbia Univ.*, 14 F.3d 773, 780 (2d Cir.), *cert. denied*, 114 S. Ct. 2693 [1994]).[22]  "By contrast, where a low-level supervisor does not rely on his supervisory authority to carry out the harassment, or a co-employee of the plaintiff is the alleged harasser, an employer will generally not be liable unless the employer either [1] provided no reasonable avenue of complaint[,] or [2] knew of the

---

[21]     *See also Murray*, 57 F.3d at 249 ("Whether the harassing conduct of a supervisor or coworker should be imputed to the employer is determined in accordance with common-law principles of agency.").

[22]     *See also Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995) ("[W]hen a supervisor wields the authority delegated to him by an employer either (a) to condition 'tangible job benefits' affecting an employee on the employee's acceptance or rejection of the supervisor's sexual demands, . . . or (b) to further the creation of a discriminatorily abusive work environment, the supervisor's conduct is deemed to be that of the employer, and the employer's liability for that conduct is absolute."); *Drew v. Plaza Const. Corp.*, 688 F. Supp.2d 270, 280 (S.D.N.Y. 2010) ("When a supervisor participates in the conduct creating a hostile work environment, liability may be imputed to the employer.").

harassment but did nothing about it." *Id.* (citing *Karibian*, 14 F.3d at 780, and *Kotcher*, 957 F.2d at 63).[23]

With regard to the requirement that the employer provide a reasonable avenue of complaint, an employer who does not have a harassment policy does not provide a reasonable avenue for complaint. *Brabson v. The Friendship House of W. N.Y.*, 46 F. App'x 14, 17-18 (2d Cir. 2002).[24] "However, there is no basis for a per se rule that the absence of a *written* . . . policy, standing alone, permits a finding that the employer has failed to provide a reasonable avenue for complaint . . . ." *Reed*, 95 F.3d at 1180 (internal quotations omitted; emphasis added).

With regard to the requirement that the employer do something about harassment of which it has knowledge, the essence of this requirement is the *reasonableness* of the employer's response to the plaintiff's complaints. *Snell v. Suffolk Cnty.*, 782 F.2d 1094, 1104 (2d Cir. 1986) ("[W]e hold today that once an employer has knowledge of a racially combative atmosphere in

---

[23] *See also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir.2000) ("[W]e have held that if harassment continues after complaints are made, reasonable jurors may disagree about whether an employer's response was adequate."); *Dobrich v. Gen. Dynamics*, 106 F. Supp.2d 386, 394 (D. Conn. 2000) (denying judgment as a matter of law where harassment continued in a different fashion after complaints were made); *Kracunas v. Iona College*, 119 F.3d 80, 90 (2d Cir. 1997) (denying summary judgment where there was four month delay between when employee complained and when employer took action).

[24] On the other hand, where there is a policy in place, some "courts have held that no reasonable fact-finder could conclude that the employers failed to provide a reasonable avenue for employees to complain of . . . harassment or discrimination." *Duch v. Kohn*, 04-CV-0109, 2007 WL 2230174, at *6 (S.D.N.Y. Aug. 3, 2007) (citing *Dawson v. Cnty. of Westchester*, 351 F. Supp.2d 176, 192 [S.D.N.Y. 2004] [other citation omitted]); *but see Hussain v. Long Island R. Co.*, 00-CV-4207, 2002 WL 31108195, at *9 (S.D.N.Y. Sept. 20, 2002) ("Although the existence of such a policy is a strong consideration when determining the reasonableness of an employer's actions, its mere existence will not necessarily relieve a defendant of its burden.").

the workplace, he has a duty to take reasonable steps to eliminate it.").[25] Furthermore, as the

Second Circuit has explained,

> Whether the company's response was reasonable has to be assessed
> from the totality of circumstances.  Factors to be considered in this
> analysis are the gravity of the harm being inflicted upon the plaintiff,
> the nature of the employer's response in light of the employer's
> resources, and the nature of the work environment.

*Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998).  Other factors may include (1)

the amount of time that elapsed between the notice and remedial action, (2) whether the response

taken comported with the employer's policies, (3) whether the co-employees complained of were

confronted and reprimanded, and (4) whether the response ended the harassment.  *See Finnerty*

*v. William H. Sadlier, Inc.*, 176 F. App'x 158, 162 (2d Cir. 2006); *Perry*, 115 F.3d at 154.[26]

### b.      Application of Legal Standard

After carefully reviewing the record, the Court concludes that Plaintiff has adduced

admissible record evidence from which a rational factfinder could conclude that the employment

---

[25]      *See also Brabson,* 46 F. App'x at 17 ("[The defendant] failed to show that [the
plaintiff's harasser] was adequately reprimanded or that any reasonable steps were taken to
prevent future conduct."); *Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir.
1995) ("An employer who has notice of a discriminatorily abusive environment in the workplace
has a duty to take reasonable steps to eliminate it."), *accord*, *Distasio v. Perkin Elmer Corp.*, 157
F.3d 55, 62 (2d Cir. 1998); *Faulkner v. Niagara Mohawk Power Corp.*, 05-CV-0974, 2006 WL
3207815, at *7 (N.D.N.Y. Nov. 03, 2006) (McAvoy, J.) (stating that an employer will not be
held liable for a hostile work environment when the employer takes "prompt and reasonable
remedial action" in response to a complaint); *Dawson v. Cnty. of Westchester*, 351 F. Supp.2d
176, 192 (S.D.N.Y. 2004) (characterizing issue as whether the employer, once notified of the
harassment, took "reasonable care to prevent the harassment or act promptly to correct it");
*Rechichi v. Eastman Kodak Co.*, 02-CV-6249, 2004 WL 1698333, at *6-7 (W.D.N.Y. Jan. 21,
2004) (stating that, "[w]here the harassment was caused by a non-supervisory co-worker, the
burden falls to the plaintiff to prove that the employer did not take reasonable steps to address
the situation") [internal quotation marks and citations omitted].

[26]      *See also Hanna v. Boys and Girls Home and Family Servs., Inc.*, 212 F. Supp.2d
1049, 1063 (N.D. Iowa 2002) (collecting cases).

environment in which he worked was objectively hostile–i.e., Plaintiff was subjected to harassment because of his membership in a protected class, and this harassment was severe enough to alter the conditions of his employment.[27]  In addition, the Court concludes that Plaintiff has adduced admissible record evidence from which a rational factfinder could conclude that this harassment can be imputed to Defendants for two reasons.

First, a question of fact remains regarding whether the employee handbook that Plaintiff received contained a formal harassment complaint procedure.

Second, even assuming that the handbook that Plaintiff received contained a formal harassment complaint procedure that Plaintiff did not follow, the Second Circuit has made clear that, generally, "[t]he question of whether an employer has provided a 'reasonable avenue of complaint' is a question for the jury."  *Reed*, 95 F.3d at 1181 (citing *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987) [noting that whether employer has taken reasonable steps to remedy discrimination is question of fact]).  This is true even where the employer has a procedure in place regarding harassment claims.  *Meritor Sav. Bank, FSB*, 477 U.S. at 72 ("[T]he mere existence of a grievance procedure and a policy against discrimination, coupled with [Plaintiff's] failure to invoke that procedure," is not enough to "insulate [the employer] from liability.").[28]

---

[27]        *See, supra,* Note 19 of this Decision and Order.

[28]        *See also Reed*, 95 F.3d at 1181 ("[M]isconduct cannot be imputed to [the] employer [simply] because [the employer] provided a procedure for use by aggrieved employees and the plaintiff had recourse to that procedure . . . . We know of no authority, and none has been drawn to our attention, to support the defendant's suggestion of an alternative per se rule that the availability of a complaint procedure and an investigation of the complaint under that procedure, standing alone, requires [the court] to reach the legal conclusion that the misconduct of a co-worker cannot be imputed to the employer.").

Third, based on management's response (or lack thereof) to instances of harassment of which they were made aware, a genuine issue of material fact exists regarding whether the procedures set up by the employer to prevent further harassment were reasonable, and/or whether the remedial actions taken by the employer in response to Plaintiff's complaints were reasonable.  This finding is supported by admissible record evidence adduced by Plaintiff from which a rational factfinder could conclude that (1) there were multiple instances in which Plaintiff was subjected to the same, or similar, types of harassment, despite complaining of the harassment to supervisors and in some cases management, and (2) with the exception of terminating McDermott after he subjected Plaintiff to racially derogatory remarks for approximately four years, the action taken by management was limited to (a) Barbara Panko telling one employee to "calm down" in response to allegedly hearing one racially derogatory remark aimed at Plaintiff, (b) Mike Sr. similarly telling another employee to "calm down" in response to allegedly hearing one racially derogatory remark aimed at Plaintiff, (c) Mike Jr. removing Plaintiff from a work site where his foreman was allegedly subjecting him to racially derogatory remarks on one occasion, and (d) Mike Jr. disciplining one employee, after Plaintiff was terminated, for making a racially derogatory statement to Plaintiff during his employment.

For all of these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff's hostile-work-environment claims.

## C.   Plaintiff's Claims of Disparate Treatment Based on His Race and/or Religion Under Section 1981 and the NYHRL

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's disparate treatment claims because he has failed to adduce admissible record evidence establishing that (1) he received unequal pay for equal work, (2) he received unequal training

compared to similarly situated individuals, or (3) he was subject to an adverse employment action and a similarly situated employee not in his protected group received better treatment.  In his response, Plaintiff argues that "Defendants have misconstrued [his] complaint in that Plaintiff makes no separate claim for discriminatory pay or training, but has only cited these instances as further evidence of discriminatory treatment."

Based on Plaintiff's statement in his response, and for the reasons stated by Defendants' in their motion papers, to the extent Plaintiff's Amended Complaint may be construed as asserting claims of disparate treatment, those claims are dismissed.

**D.     Plaintiff's Claims of Retaliation Based on His Race and/or Religion Under Section 1981 and the NYHRL**

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's retaliation claims because he has failed to adduce admissible record evidence establishing that his termination was retaliatory.  Based on the current record, the Court accepts Defendants' argument.

**1.     Plaintiff's Claim of Retaliation Based on His Religion Under 42 U.S.C. § 1981**

As an initial matter, "[r]etaliation claims are cognizable under § 1981, . . . but only where the retaliation arises out of a § 1981 claim."  *Nofal v. Jumeirah Essex House*, 09-CV-2994, 2010 WL 4942218, at *4 (S.D.N.Y. Dec. 3, 2010).  "Although making a complaint constitutes protected activity, to state a claim for retaliation under § 1981, the complaint must be protected under § 1981–that is, it must relate to discrimination under § 1981, not just under any statute."  *Nofal*, 2010 WL 4942218, at *4; *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998) ("[T]o be actionable under § 1981, the retaliation must have been in response to the claimant's assertion of rights that were protected by § 1981. An act of retaliation for engaging in

31

activity protected by Title VII does not give rise to a claim for retaliation that is cognizable

under § 1981 unless that activity was also protected by § 1981.").  Therefore, to the extent

Plaintiff's Section 1981 retaliation claim is based on Defendants' failure to provide religious

accommodation, it is dismissed.

>  **2.      Plaintiff's Claims of Retaliation Based on His Race Under Section
> 1981 and His Race and/or Religion Under the NYHRL**

"To make out a prima facie case of retaliation, under . . . Section 1981 and NYSHRL, a

plaintiff must show [the following]: (1) participation in a protected activity known to

Defendants; (2) an adverse employment action; and (3) a causal connection between the two."

*Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp.2d 305, 341 (S.D.N.Y. 2009) (collecting cases).

"The term 'protected activity' refers to action taken to protest or oppose statutorily

prohibited discrimination."  *Cruz*, 202 F.3d at 566 (noting that a protected activity need not "rise

to the level of a formal complaint in order to receive statutory protection").  Protected activities

encompass "making complaints to management, writing critical letters to customers, protesting

against discrimination by industry or by society in general, and expressing support of co-workers

who have filed formal charges."  *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d

Cir. 1990).  A plaintiff "need not establish that the conduct [he] opposed was in fact a violation

of [the law]," *Bush v. Fordham Univ.*, 452 F. Supp.2d 394, 416 (S.D.N.Y. 2006), but he must

demonstrate a "good faith, reasonable belief that the underlying challenged actions of the

employer violated the law."  *Sumner*, 899 F.2d at 209.

Adverse employment action is any employer action that "well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination."  *Burlington N. &*

*Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2415 (2006).  "[T]ermination is an adverse employment

action." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).  Similarly, being laid

off constitutes adverse employment action.  *See Galabya*, 202 F.3d at 640 (2d Cir. 2000); *Walker*

*v. City of New York*, 98-CV-2695, 2002 WL 31051534, at *4 (E.D.N.Y. July 22, 2002)

("Plaintiff's temporary lay-off during the summer of 1997 [was] sufficient to meet Plaintiff's

burden of putting forth evidence to show that the terms of her employment were altered.").[29]

A plaintiff may establish a casual connection between the protected activity and the

adverse employment action "either (1) directly, through evidence of retaliatory animus directed

against the plaintiff by the defendant[,] or (2) indirectly, by showing that the protected activity

was followed closely by discriminatory treatment." *Schanfield*, 663 F. Supp.2d at 343 (citing

*Knight v. City of New York*, 303 F. Supp.2d 485, 496 [S.D.N.Y. 2004]).

"Direct evidence giving rise to an inference of discrimination may include 'a showing

that the employer criticized the plaintiff's performance in ethnically degrading terms, made

invidious comments about others in the employee's protected group, or treated employees not in

the protected group more favorably.'" *Id.* (quoting *Hunter v. St. Francis Hosp.*, 281 F. Supp.2d

534, 542 [E.D.N.Y. 2003]).

In order for a court to "accept mere temporal proximity between an employer's

knowledge of protected activity and an adverse employment action as sufficient evidence of

causality to establish a prima facie case," the temporal proximity must be "very close." *Clark*

*Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing cases finding temporal proximity of

three months and more to be insufficient).

---

[29]      *Cf. Leibowitz v. Cornell Univ.*, 584 F.3d 487, 501 (2d Cir. 2009) ("An employee
seeking a renewal of an employment contract, just like a new applicant or a rehire after a layoff,
suffers an adverse employment action when an employment opportunity is denied and is
protected from discrimination in connection with such decisions under Title VII and the
ADEA.").

33

"Under *McDonnell Douglas*, once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the defendant to proffer a legitimate, non-discriminatory business rationale to justify its adverse employment action." *Schanfield*, 663 F. Supp.2d at 343.  "If the . . . defendant . . . points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra v. Gen. El. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).

Here, Plaintiff argues that complaining to Leo Kane about his treatment at Panko constituted participation in protected activity, which was known to Defendants because Leo Kane met with Mike Jr. after meeting with Plaintiff.  Plaintiff further argues that he was terminated as a result of engaging in protected activity, as evidenced by the temporal proximity between Mike Jr.'s meeting with Leo Kane and Plaintiff's termination.  Based on the current record, the Court finds that Plaintiff has established a prima facie case of retaliation.

However, in response to Plaintiff's claim of retaliation, Defendants have articulated a legitimate, nondiscriminatory reason for Plaintiff's termination.  More specifically, Defendants have adduced admissible record evidence establishing that Plaintiff was terminated for insubordination.

In an effort to satisfy his burden of demonstrating that Defendants' reason for terminating him is pretextual, Plaintiff argues that the admissible record evidence establishes that he was not insubordinate before he was terminated.  As noted above in Part III.B. of this Decision and Order, the Court disagrees.  The Court would add only two points.  First, Plaintiff's argument that Defendants terminated him in retaliation for complaining to Leo Kane is undermined by the fact that the termination occurred more than two months after the complaint.  Second, Plaintiff's

argument that his termination was caused by Mike Jr.'s learning of Plaintiff's complaint to Leo Kane is undermined by the fact that, (1) promptly after being informed by Mr. Kane that Plaintiff had complained that he was being discriminated against at the work place, Mike Jr. agreed to meet with (and did meet with) Leo Kane, and (2) six days *after* Mike Jr. met with Leo Kane, Defendants brought Plaintiff back to work.

For these reasons, Plaintiff's retaliation claim is dismissed.

### E.      Plaintiff's Claims Against the Individual Defendants

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's claims against the individual Defendants based on their lack of personal involvement in the violations alleged.  Based on the current record, the Court rejects Defendants' argument.

"[I]ndividuals may be held liable under § 1981."  *Whidbee*, 223 F.3d at 75.  However, "in order to make out a claim for individual liability under § 1981, a plaintiff must demonstrate 'some affirmative link to causally connect the actor with the discriminatory action.'"  *Id.* (quoting *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 983 [10th Cir. 1991]).  "A claim seeking personal liability under section 1981 must be predicated on the actor's personal involvement."  *Id.*  "Personal involvement, within the meaning of this concept, includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations are occurring."  *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004).[30]

---

[30]      *See also Brown v. N.Y.S. Dep't. of Corr. Serv.*, 583 F. Supp.2d 404, 411 (W.D.N.Y. 2008) ("Each defendant is alleged to have directly participated in the harassing behavior giving rise to the hostile work environment, except for defendant Sergeant Keough, who is alleged to have either personally witnessed the harassment of plaintiff or received direct complaints from plaintiff about that harassment, and done nothing in response. . . . That is

Here, Plaintiff has adduced admissible record evidence from which a rational factfinder could conclude that (1) Mike Jr. was present during at least one incident of harassment, (2) Plaintiff complained to Mike Jr. on more than one occasion about being harassed, (3) Plaintiff continued to be harassed after he complained to Mike Jr., (4) Mike Sr. was present during two incidents of harassment, one of which involved Bill Cummings in 2001, (5) Plaintiff continued to be harassed by Bill Cummings after Mike Sr. heard Bill Cummings make racially offense comments about Plaintiff, (6) Barbara Panko was present during two incidents of harassment, one of which involved Bill Cummings in 2001, and (7) Plaintiff continued to be harassed by Bill Cummings after Barbara Panko heard Bill Cummings make racially offense comments about Plaintiff.  Based on the record, the Court finds that a rational factfinder could conclude that each individual Defendant was personally involved in the alleged acts of discrimination.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 35) is

**GRANTED** in part and **DENIED** in part in the following respects:

(1) Plaintiff's discrimination claims against all Defendants, Plaintiff's retaliation claims against all Defendants, and Plaintiff's disparate-treatment claims against all Defendants are **DISMISSED**; and

---

enough to satisfy the personal-involvement requirement."); *Hawkins v. Cnty. of Oneida*, 497 F. Supp.2d 362, 377 (N.D.N.Y. 2007) (Hurd, J.) (denying motion to dismiss C.O.'s Section 1981 hostile-work-environment claims against sergeant who was present when co-worker made racist and racially charged remarks toward plaintiff, and against lieutenant to whom plaintiff complained about racist remarks and treatment); *Amin v. Quad Graphics,* 929 F. Supp. 73, 78 (N.D.N.Y. 1996) (Homer, M.J.) (holding that the "element of personal involvement may be satisfied by proof that a supervisor had knowledge of alleged acts of discrimination and failed to remedy or prevent them").

(2) Plaintiff's hostile-work-environment claims against all Defendants survive

Defendants' motion for summary judgment; and it is further

**ORDERED** that counsel are directed to appear on APRIL 20, 2011 at 3 00 p.m. in

chambers for a pretrial conference, at which counsel are directed to appear with settlement

authority, and in the event that the case does not settle, trial will be scheduled at that time. If

plaintiff's counsel would like to participate via telephone conference, counsel should make that

request in writing. Plaintiff is further directed to forward a written settlement demand to

defendants no later than April 6, 2011, and the parties are directed to engage in meaningful

settlement negotiations prior to the 4/20/11 conference.

Dated: March 23, 2011
        Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge